# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**

v.

**OSCAR JAIRO JAVIER-JAZMIN &
WILSON ALVAREZ-BARRERA**
Defendants.

Criminal No. 17-126 (ADC/BJM)

## REPORT AND RECOMMENDATION

Oscar Jairo Javier-Jazmin ("Javier") and Wilson Alvarez-Barrera ("Alvarez") (collectively "Defendants") were charged with one count of possession with intent to distribute controlled substances, 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii). Dkt. 15. Defendants filed a motion to suppress evidence found after a vehicle stop and uncovered after the resulting arrest. Dkt. 36. The government opposed. Dkt. 43. This matter was referred to me for a report and recommendation. Dkt. 50. Hearings were held on November 29 and December 10, 2018 and on January 22 and February 19, 2019. Dkts. 56, 58, 60, 62. The parties filed post-hearing briefs. Dkts. 87, 88.

For the reasons set forth below, the motion should be **DENIED**.

## BACKGROUND

The following account is drawn from the evidence, testimonial and documentary, received at the suppression hearing. The government presented as witnesses: Puerto Rico Police Department ("PRPD") Officer Peter Kalme, who is attached to the Drug Enforcement Administration ("DEA") Task Force; U.S. Customs and Border Protection agent Roymi Nieves, PRPD Officer Omar O. Melendez-Maldonado ("Melendez") , who is attached to the DEA Task Force; PRPD Officer Hector Cintrón Colón, who works for Rapid Action United Forces ("FURA");  and PRPD Officer Alberto Jose Rivera Ortiz, who directs the PRPD canine division. The events relevant to this motion unfolded over the course of three days in February 2017.

***February 9, 2017***

On February 9, 2017, A source of information (SOI) told Román Ríos, a PRPD officer attached to the DEA Task Force, and Melendez that a drug smuggling operation would take place the next day. The SOI had worked with other police officers before, and one of those officers referred the SOI to Melendez. The SOI told Melendez and Ríos that two individuals in Barrio Obrero, a San Juan neighborhood, were preparing to take a white watercraft to Fajardo, Puerto Rico around 6:00 p.m. on February 10, 2017. The SOI described the individuals as being of Dominican descent: one was skinny and dark-skinned ("*trigueño*") with dreadlocks, and the other was chubby and dark-skinned ("*trigueño*"), also with dreadlocks. The SOI stated that they would use a black Lincoln SUV to tow the vessel. From Fajardo, they would navigate to St. Thomas, get about 50 kilograms of cocaine, and return to Fajardo on February 11, 2017 around 9:00 a.m. The SOI described the vessel as a yawl with a hidden compartment. The SOI did not provide names of the suspects, of the homeowner, car owner, or the vessel owner. The SOI did not name a specific drug cartel, just an organization in Barrio Obrero. Melendez did not make an audio recording of the tip or take notes.

On the SOI's suggestion, Ríos, Melendez, and the SOI took an unmarked, official vehicle to the residence where the vessel was parked, so the SOI could show them where it was. A third agent accompanied them. The residence in question sits on a property adjacent to two housing projects. *See* Ex. 13 (aerial map); Ex. 13.1 (residence is circled, projects are numbered). The main thoroughfare is not wide, and there is nowhere to park. The property is separated from the sidewalk and street by a gate and a fence made of concrete and galvanized steel. Three structures are on the property: two are on either side of a short, unpaved driveway, and the third is at the end of the road. To knock on the door of any structure, you must pass through the gate. There is no intercom system available. Melendez did not investigate who owned the property or structures.

The three agents and the SOI drove past the residence twice; they did not stop or conduct surveillance. Melendez testified that he thought the proximity of the housing projects and the car's heavily tinted windows might make them a target. Melendez did take pictures in the car on this cell phone. The pictures depict a small vessel in front of the residence and the prow of another vessel in the back. Ex. 15. The photos lack a timestamp, a date, and a photographer's signature. They do not show the street or address of the house. *Id.* The vessel at the front, marked by a circle in Ex. 13.2, was visible from the front of the house, and a photo depicts its registration number. Ex. 14. The vessel further back on the property by the house, marked by a rectangle in Ex. 13.2, was partially visible from the street. Ex. 15.

After driving past the residence with the SOI, Melendez and Ríos discussed what they had seen with Kalme. Kalme testified that the agents observed a white vessel under a tent canopy with a Continental-brand trailer and the serial number PR7897HH. The boat was registered in the name of Angelica Carrasquillo Collazo. Kalme stated that the agents told him that vessel would be used for the drug transaction, and that they took photos. Ex. 1; Ex. 1a (close-up of Ex. 1). Kalme did not speak with the SOI or visit the residence.

Kalme testified that he coordinated the surveillance in this case. The agents briefed Kalme on the SOI's tip after their drive past the residence in Barrio Obrero, but he already had the address of the residence and expected them to be looking for a white vessel before they went to the residence in question. On March 7, 2017 Kalme amended a February 9 report about the tip and observation to indicate that the agents saw two boats at the residence, which he did not recall being told in their meeting. Melendez did not recall filing a report in this case at any time after February 9. Kalme stated that no reports relating to the events of February 9, 2017 mention the SOI participating in the drive by.

### February 10, 2017

On February 10, Melendez and Ríos decided to drive by the residence in question on their way to the office in Fajardo. The SOI was not with them. The gate blocking the

unpaved road onto the property was open, and the agents entered the property in their car. They did not ask for permission. Melendez testified that he could see a vessel and a large, black SUV. The SUV was parked to the left of the driveway, partially shielded from the street by one of the structures on the property. The vessel was similarly shielded from the street and parked across the driveway, behind a residence. Its prow was visible. The agents drove toward the rearmost structure. When they reached it, they could see two men working near the front of the vessel. Melendez stated that the men were both dark-skinned with braids; one was skinny and the other fat. In court, Melendez identified the defendants as the same men he saw that day. Melendez testified that he could not see what they were doing in the vessel.

When the two individuals noticed Melendez and Ríos, Melendez and Ríos rolled down the window of their SUV and asked in Spanish for directions, pretending to be lost. Melendez stated that they did so because they did not want anyone to suspect that they were police officers. Melendez testified that the individuals responded in Spanish and spoke with Dominican accents. Melendez and Ríos then turned around and left the property. They did not take any pictures, but Melendez remembered the vessel registration number and the Lincoln SUV license plate number even though he did not write them down. They arrived at their office in Fajardo and briefed Kalme.

Kalme testified that the surveillance had occurred between 2:00 p.m. and 3:00 p.m.[1] Kalme testified that the agents told him that they saw the two individuals working inside the vessel, near its prow, but that they could not see what the individuals were doing. The agents informed Kalme that a black Lincoln Aviator SUV, license plate GAG532, was parked on the property. Melendez did not describe what the individuals were wearing, and he does not recall if Kalme took notes.

---

[1] The Complaint states that this surveillance occurred at 6:27 p.m. Dkt. 3 at 8.

When he received the information, Kalme drafted an email to alert other law enforcement officers to a potential drug transaction. Ex. 9. He sent the email to Customs and Border Protection, the Coast Guard, and others. Kalme did not alert his counterparts at the St. Thomas office. The email included attached photos of two distinct vessels and the SUV. The body of the email did not describe the car, and it refers only to a fishing vessel with a single outboard engine. The email did not include a description of the boat's color or include its serial number. Kalme stated that, when he sent the email, he already had a plan to search for the suspects and placed the majority of his team in Fajardo, Puerto Rico. Kalme believes that the SUV towing the vessel left Barrio Obrero around 5:00 p.m. on February 10, but no one followed the SUV from the targeted residence to Fajardo.

Nieves, a maritime interdiction agent, received Kalme's email a little after 4:00 p.m. Nieves was off-duty, driving toward San Juan on Highway 3. At a traffic light, Nieves checked his email and read the message from Kalme. Nieves testified that the email described two dark-skinned individuals from Barrio Obrero and a "yola," or yawl, type vessel to be used in a drug transaction, and its attachments included pictures of a vessel. *See* Ex. 9 (Kalme's e-mail). Nieves continued to drive and came to another stoplight ten to twelve minutes later. He stopped in the first position in the leftmost lane, headed westbound toward San Juan. Heading in the opposite direction and stopped at the same intersection, was the vessel in Kalme's email. Nieves testified that, when he saw the vessel and the car towing it, he checked his email again to confirm his identification. The SUV and vessel were in the third position in the second lane, and Nieves stated that he accelerated slowly in order to get a "good look" at the vehicle and vessel, but he did not take any photos or follow the vessel.

Nieves instead called Kalme to inform him that he had seen the vessel. He did not call anyone else, and he did not know about the operation or detain the suspects with the vehicle and vessel. Kalme testified that Nieves could not give him the license plate number during the phone call and identified the vehicle as a black Lincoln Navigator. Kalme

testified that Nieves said the vessel had a "70" in the registration number. After the call, Melendez testified that Kalme explained what Nieves had seen to Melendez and Ríos.

Around 5:00 p.m., Nieves forwarded Kalme's email to his coworkers. Nieves informed them that he had seen the vessel, but he did not specify which of the two vessels in the attached photos matched the vessel he saw on Highway 3. *See* Ex. 10.

Melendez stated that Kalme gave instructions as to what the agents would do to intervene with the suspects before the search began. Then, while it was still light out, Melendez and about six or seven other agents went to the Fajardo area to search for the vessel. They searched different areas. Melendez stated that Kalme called him to inform him that Kalme had found the SUV in Las Croabas in Fajardo. Melendez thought that it took about four or five hours from the beginning of the search, and he did not remember the exact time the vehicle was found.

### *February 11, 2017*

#### Search in Fajardo

Kalme testified that he found the vehicle and the trailer, used for towing the vessel, shortly before sunrise on February 11. The SUV was parked behind a business, and Kalme thought that it had been purposefully hidden from view even though it was in a parking lot. The trailer did not have the vessel on it and the trailer was not with the car. Kalme testified that he took a photograph of the vehicle, but not its license plate, and that he did not take a photo of the trailer. Kalme stated that the vehicle had its paperwork up to date and there was no sign of illegal activity. Kalme then stationed agents in the area on land and water. He and a partner relocated to a spot that the vehicle and vessel would have to pass when leaving Las Croabas.

The same morning, Cintrón began his shift at 4:00 a.m. Cintrón is a PRPD officer attached to FURA in Fajardo. FURA is dedicated to protecting the coastline at sea and onshore. During the shift, his supervisor told him that a vessel was going to arrive in Fajardo. Cintrón did not know that it was coming from St. Thomas. Cintrón and a colleague

searched for the vessel in a boat for two to three hours but did not notice anything in the area. They returned to port around 6:00 a.m. because his colleague's shift ended and FURA policy prohibits officers from piloting a boat alone. Back on land, Cintrón patrolled Las Croabas in a marked vehicle. Cintrón did not know if any other boat patrols searched other areas and confirmed that his boat was the only vessel searching in the Fajardo area. Neither Cintrón nor his supervisor called the Coast Guard.

Around 7:15 or 7:30 a.m., Nieves testified that he saw the vessel again. Nieves was off-duty, spending time at the Las Croabas recreational park with his family. Nieves saw the vessel coming out of the water at the boat ramp, and he testified that the registration number on the vessel was the same as the number in the emailed photo and on the highway from the prior evening. Ex. 12.1 (a circle marks the vehicle, a triangle marks the vessel). Nieves saw one person hitching the vessel to the vehicle and inferred that a second must be present. He described the person he saw as having dark skin. Nieves called Kalme to inform him that the vessel was being towed from the water and the general direction in which it was headed from Law Croabas. He did not take any pictures or describe the individual's clothing or hair. Nieves testified that he did not see any other agents that day.

Kalme recalled that Nieves called him in the morning to say that the boat was coming out of the water. Kalme and his partner began to follow the vehicle when it passed them, hauling the vessel. Kalme testified that he noticed that the trailer was missing a lightbulb, which is a traffic violation. This was the only illegal thing he noticed. Kalme testified that he called FURA officers, who are part of PRPD, to pull over the vehicle for the missing light.

Cintrón's supervisor received a phone call from Kalme that morning with the same information. At the hearing, Cintrón could not remember the details his supervisor gave him, but he recalled that the vessel was a "make-shift boat, white." Cintrón took his marked vehicle and drove down the highway from Fajardo toward Luquillo in accordance with his supervisor's instructions. Cintrón was alone. He spotted the vehicle with a vessel driving

ahead of him. Cintrón noticed that the vessel did not have a functioning, red reflector light. *See* Ex. 3 (showing use of a clear rather than a red plastic cover on the taillight to indicate braking). The area circled in Exhibit 3.1 marks what Cintrón testified was a violation Law 22 of Puerto Rico's vehicle code. Cintrón also stated that the light did not illuminate as it should have. Cintrón turned on his sirens and lights and pulled the vehicle over for the infraction.

**Traffic Stop**

Kalme, driving an unmarked vehicle, pulled over some distance behind Cintrón and the vehicle. Kalme testified that he matched the license plate on the vehicle to the SOI's tip and that the rims on the vehicle matched the rims he had seen on the vehicle at Las Croabas. *See also* Ex. 6 (vehicle and vessel at traffic stop); Ex. 2 (vehicle at Las Croabas). Cintrón encountered two individuals in the vehicle towing the vessel. The passenger, later identified as Wilson Alvarez-Barrera, had dark skin and dreadlocks. The driver, later identified as Oscar Javier-Jazmin, wore a gray shirt. *See* Ex. 4. Kalme described Cintrón as wearing his FURA maritime uniform with an ID around his neck and a pistol holstered at his waist. Cintrón asked for license and registration. Javier provided a driver's license, but he did not produce the vehicle registration. Out of concern for his safety, Cintrón asked the men to step out of the vehicle and stand near its hood; he did not know where Kalme was and had no partner at the scene. Cintrón did not see or smell any illegal activity, aside from the traffic infractions. Cintrón also testified that he was not yet certain that the vehicle he pulled over matched the vehicle than Kalme had flagged. Kalme stated that Cintrón searched the vehicle and received permission for a K-9 unit to perform a search, but Cintrón did not mention conducting a search or securing consent for a K-9 search in his testimony.

There is another discrepancy. Kalme testified that he exited his vehicle and joined Cintrón, Javier, and Alvarez at the car about fifteen minutes after the stop began and as the K-9 unit arrived. Kalme testified that Cintrón was issuing a ticket and waiting for the K-9 unit when Kalme walked over, chatted with Javier and Alvarez, and asked for consent to

search. Kalme stated that he wore jeans, a polo shirt, and a weapon holstered at his waist. He kept his DEA credentials in a black wallet, which he opened to show Javier and Alvarez. Kalme acknowledged on the witness stand that, at that point, Javier and Alvarez were already suspects. Cintrón stated that only three to five minutes had passed after the initial stop. The men do agree that after Kalme walked over to the vehicle, Cintrón told him that Javier lacked vehicle registration. Javier told Cintrón that he and Alvarez had taken the vessel out of the water and were returning to San Juan. Cintrón asked for consent to search the vehicle and the vessel. Javier consented to a search of both. Kalme then asked for consent to search the vehicle and vessel, and Javier consented to both again. Kalme thought that Javier and Alvarez looked shaky and nervous.

Kalme and Cintrón agree that Joel Mercado, a K-9 officer with the PRPD, and his canine, Fuhrer, arrived just as they were both about to begin searching the vehicle and vessel. Kalme had coordinated his arrival, and there was no testimony that Cintrón knew there would be a canine search. Cintrón informed Mercado that Javier had consented to a search of the vehicle and of the vessel, and Mercado asked Javier for consent and received it. Cintrón testified that, during this time, no one drew a gun and Javier did not withdraw consent. Cintrón did not have a consent form and did not remember anyone presenting one at the scene; Javier did not sign a consent form for the search of either the vehicle or the vessel.

Mercado was not available to testify at the suppression hearing, so the government called Alberto José Rivera Ortiz ("Rivera"), the Director of the PRPD Canine Division. Rivera testified about canine police training procedures and generally how canines and their handlers communicate. A canine handler and the canine progress through trainings designed to teach canines to identify a target substance by sitting down, which is considered an "alert." Handlers are also trained to recognize other forms of alert because circumstances may preclude a canine from sitting. A handler or a person involved with training a canine is equipped to interpret an alert, but prior knowledge of the canine is

necessary to ascertain whether conduct is an alert or not. According to Rivera, only the handler and the trainer know if a dog is alerting. At the time of the events in this case, the PRPD required canines and their handlers to perform four hours of training per week. The PRPD did not conduct annual re-certification trainings for canine units. In 2017 after the events of this case, PRPD instituted new best practices, including coaching officers on civil rights and case law related to K-9 searches, and annual re-certifications for canine units. Mercado and Fuhrer began working together in 2014, and they were re-certified in April 2017 and in 2018. Ex. 18; Ex. 19. To certify a canine unit, the unit is evaluated in vehicle, structure, and open area searches.

Rivera worked with Mercado and Fuhrer during their training process. Based on Rivera's personal knowledge of Fuhrer, drawn from observations of Fuhrer in training and working in the field, Fuhrer normally alerts by sitting and by looking at Mercado. Rivera testified that Fuhrer is trained to alert by sitting. Rivera did not train, certify, or handle Fuhrer. According to Rivera, only the handler and the trainer know if a dog is alerting.

Fuhrer searched the vehicle, and then he was placed into the vessel. Cintrón observed the canine sit near the prow of the vessel. *See* Ex. 5; Ex. 6.1 (circle marking where Fuhrer sat). Kalme also saw Fuhrer sit. Kalme testified that Mercado told him that Fuhrer, by sitting, was alerting to the presence of narcotics. The officers observed nothing illegal on the boat after the alert. In addition, Kalme testified that Fuhrer also alerted near the driver-side door of the vehicle, but this information is not in the affidavit supporting the complaint. An Agent Francis wrote the affidavit using facts from Kalme and the other agents, but Kalme reviewed it and substantially agreed with its contents.

When the dog sat in the vessel, Cintrón issued two Law 22 tickets for the taillight infraction and the lack of vehicle registration, respectively. Ex. 16; Ex. 17. Cintrón recorded the date incorrectly on one ticket. *See* Ex. 16. In the meantime, Kalme continued with his investigation. Cintrón did not see Mercado search the boat; he did not see anyone move the white cooler pictured in Exhibit 5, and he did not see drugs, weapons, or money during the

stop. Cintrón testified that if he had pulled the car over only for the traffic violations, then he would have let the individuals go. Instead, Kalme arrested Javier and Alvarez, Mirandized them, and transported them to the HIDTA offices in Fajardo along with the vehicle and the vessel. Kalme testified that they moved locations because it was better to search away from the busy highway. The vehicle and the vessel, still on its trailer, were all moved together. At the HIDTA offices, Kalme placed Javier and Alvarez in a small interrogation room. Kalme testified that they received the DEA 13B form to read their rights. Javier and Alvarez signed and initialed the forms, and they declined to continue with the interview. Javier received and signed a consent form to search the vehicle and the vessel. Ex. 7; Ex. 8. Officers completed searching the vehicle and the vessel, and the parties stipulated that contraband was found on the vessel. Kalme, who was present during the search, observed that the contraband was located at the vessel's prow, near where Fuhrer sat down. Kalme testified that the area appeared as if it had been worked on.

On September 11, 2017, Kalme prepared an investigation report. It refers to the DEA6 form that a colleague had prepared regarding the events on February 9 and February 10, 2017. Kalme reviewed that form, and he knew that it omitted details of the surveillance operation. Kalme testified that he corrected the form to include that agents performed drive-by surveillance rather than surveillance of the residence while parked. It was during the drive-by that the saw the vessel with two individuals near the prow and observed no illegal activity.

## DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The central inquiry is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *United States v. Weikert*, 504 F.3d 1, 6 (1st Cir. 2007) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). In general, "[a] nonconsensual search or seizure is unreasonable in the absence

of a judicial warrant issued upon probable cause." *Ahern v. O'Donnell*, 109 F.3d 809, 816 (1st Cir. 1997). Probable cause is a fluid standard measured by whether the totality of the circumstances support a reasonable person's belief that a crime has been or is being committed. *See Illinois v. Gates*, 462 U.S. 213, 235 (1983); *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949).

Defendants contend that law enforcement agents made three unlawful searches or seizures during their investigation which merit the suppression of evidence: their entry onto the property, the traffic stop, and the K-9 search. Dkt. 87 at 2. The government opposed the latter two arguments but left the agents' entry unaddressed. Dkt. 88 at 8, 10.[2]

Defendants first argue that Melendez and Ríos committed an unconstitutional search when they drove through the open gate and onto the property containing two vessels and the Lincoln SUV because that entry violated the expectation of privacy of its occupants. Dkt. 87 at 16–18. Fourth Amendment analysis must always begin with the reasonable expectation of privacy. *See United States v. Lipscomb*, 539 F.3d 32, 36 (1st Cir. 2008). The Fourth Amendment is a personal right, and "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable" to receive its protections. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)).

There was no testimony at the suppression hearing regarding who owned the property in question, who lived at the property in question, or the Defendants' relationship to the property in question. Melendez confirmed only that he did not investigate who owned the property or the structures on it. Such information is integral to a reasonable expectation of privacy analysis because the reasonableness of one's expectations varies with ownership, tenancy, duration of stay, commercial versus residential purposes and so on.

---

[2] The government further notes for the court that Defendants failed to file affidavits with their October 2017 reply motion in violation of Local Rule 147(a) and suggests the motion to suppress could be denied on these grounds. Dkt. 88 at 8. As the government correctly observed, the time to object to such an omission has long since passed.

*See, e.g.*, *Carter*, 525 U.S. at 90–91. Melendez did testify that the vessel nearer to the house was registered to Angelica Carrasquillo Collazo, who is not party to this case. Because Defendants never established a reasonable expectation of privacy, the court should find that agents did not violate the Fourth Amendment by entering the property.

In the alternative, if Defendants indeed resided in one of the dwellings on the property, they would have had a reasonable expectation of privacy in the property. This would provide Fourth Amendment protection for their home and its curtilage, or the immediately surrounding area associated with the home. *United States v. Smith*, 919 F.3d 1, 13 (1st Cir. 2019) (citing *Florida v. Jardines*, 569 U.S. 1, 5 (2013)). As a preliminary matter, aspects of the home visible from public thoroughfares are not protected, so the photographs Melendez took of the vessels and their registration numbers were lawfully obtained. *See Jardines*, 569 U.S. at 7 (citing *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). The remaining evidence gleaned from the entry into the property includes the officers' observation of the Lincoln SUV's license plate number and of the Defendants themselves, who were noted to match the SOI's physical descriptions. "[W]hen an officer physically intrudes on the curtilage to gather evidence, a Fourth Amendment search has occurred and is presumptively unreasonable absent a warrant." *Collins v. Virginia*, 138 S. Ct. 1663, 1666 (2018). For that evidence to be lawfully obtained, the unpaved road between the three structures may not be curtilage.

The Supreme Court describes a home's curtilage as "an area adjacent to the home and 'to which the activity of home life extends.'" *Jardines*, 569 U.S. at 7 (quoting *Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984)). The Court illustrated this concept in *Collins*, where it included "a partially enclosed top portion of the driveway that abuts the house" in the curtilage. *Collins*, 138 S. Ct. at 1671. The area was beyond the steps that gave access to the front porch. *Id.* A warrantless search of a motorcycle parked in that "driveway enclosure" violated the Fourth Amendment. *Id.* The extent of a home's curtilage can be determined by referring to four factors laid out in *Dunn*. *United States v. Dunn*, 480 U.S.

294, 301 (1987). Curtilage should be analyzed by examining "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.*

Melendez testified that the property was fenced in. Exhibit 15 depicts the unpaved road leading from the street to the three structures on the property. The unpaved road is more properly called an unpaved driveway: it is short and quite clearly leads nowhere other than the rearmost structure on the property, which resembles a home. There are satellite receptors for television, windows partially open to catch the breeze, and chairs along the second-floor balcony. Between the dwelling and the structure on the right, which resembles a small workshop or garage, are a red SUV and a vessel under a white canopy shade. They are adjacent to the home, and Melendez testified that the Defendants were working on the boat when he and Ríos entered the property, indicating that home life extended beyond the home's porch. The Lincoln SUV was across from the red SUV and vessel, immediately behind the structure on the left. It is not visible in any photo, and Melendez stated that he could not see it or its license plate from the street. It is parked further from the home than the vessel and vehicle but would qualify as adjacent to the home and at the top of the driveway. When Melendez and Ríos drove onto the property, they physically intruded on the curtilage of the residence.

The Supreme Court in *Collins* considered an enclosed area adjacent to the home and on the driveway past the steps to the front porch to be curtilage. The holding coexists with an earlier holding that law enforcement officers without a warrant, like any private citizen, have the right to enter curtilage and knock on a front door. *Kentucky v. King*, 563 U.S. 452, 469 (2011). This license to enter property is limited to a specific area and a specific purpose. *Smith*, 919 F.3d at 10 n.6. *Jardines* explained how Fourth Amendment protections coexist with this implied license of entry:

> This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.

*Jardines*, 569 U.S. at 8 (internal marks omitted). The First Circuit, in deciding *Smith*, assumed *arguendo* that the locked gate the law enforcement agent evaded "revoked the implied license of entry." *Id.* In another case, officers who passed through the back gate without force in order to knock on the front door of a residence did not violate the Fourth Amendment. *United States v. Pérez-Díaz*, 848 F.3d 33, 39 (1st Cir. 2017). *Jardines* offered that using a metal detector on the front path or bringing a bloodhound to sniff the garden would exceed this implied license. *Jardines*, 569 U.S. at 9. The implied license can simply be defined as coextensive with social norms, or what any private citizen would reasonably expect to be permissible—mainly, approaching a home, approaching the front door, knocking, and speaking with the occupant, if the occupant chose to answer the knock. *Jardines*, 569 U.S. at 9, 9 n.4.

Melendez and Ríos entered the driveway through an open gate. They remained in their car on the driveway, and they did not leave the driveway or pass the front porch deeper into the property, as the officer did in *Collins*. They did not search the area but observed only what was in plain view. They could observe the vessel, the two dark-skinned men working in it, the black Lincoln SUV, and the SUV license plate from the driveway. They spoke to the men, who responded with Dominican accents. From the driveway, then, they corroborated the remainder of the SOI's tip. Defendants do not dispute these facts, and they do not cite any case law which would place Melendez and Ríos outside the implied license of entry. *See* Dkt. 15–18. Even if the court determines that Defendants had a reasonable expectation of privacy in the property, the evidence gathered at the residence and its fruit

should not be suppressed because the law enforcement agents had license to be on the driveway.

Defendants next argue that Cintrón's traffic stop violated Defendants' Fourth Amendment rights. In support, Defendants cite *Arvizu*, which pertains to investigatory stops of motor vehicles. Dkt. 87 at 18; *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The officer in *Arvizu* made a stop based on reasonable suspicion and without any proof of traffic infraction, unlike Cintrón in the instant case. *See id.* at 270–273. Defendants also focus on the allegedly pretextual nature of the stop, arguing that it was illegitimate because Cintrón made the stop based on the investigation rather than on the taillight infraction. Dkt. 87 at 18–22. A pretextual stop, however, is constitutional. *Whren v. United States*, 517 U.S. 806 (1996). Where police officers have probable cause to believe that a driver has violated the traffic code, they may stop the vehicle under the Fourth Amendment. *Id.* at 819. Ulterior motives, such as a tip that the vehicle contains illicit goods, do not invalidate an officer's objectively reasonable action. *Id.* at 812–13.

Here, Kalme noticed the vehicle and followed it before any observed traffic violation. Cintrón also noticed and followed the vehicle before he observed any violation or legal infraction. Merely trailing a vehicle, however, is not a search. Cintrón pulled the vehicle over after he observed a violation of Law 22: the light on the back of the vehicle lacked a red plastic covering. *See* 9 L.P.R.A. § 5406(a). The violation gave Cintrón probable cause to stop the vehicle regardless of his supervisor's instructions. *See Whren*, 517 U.S. at 813. Accordingly, the stop was lawful and did not violate Defendants' Fourth Amendment rights.

Once a vehicle has been pulled over for a traffic infraction, a police officer may request permission to conduct a search. Defendant suggests that a full vehicle search cannot be predicated on a traffic infraction, which is correct. Dkt. 87 at 13 (citing *Knowles v. Iowa*, 525 US 113, 118 (1998)). But the consent search is another exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

The government bears the burden to prove that consent is valid, meaning that it is free and voluntary. *See id.* at 222 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). Voluntary consent is that given without implicit or explicit coercion, threats, or force, but the individual who gives consent does not need to be advised of his right to refuse consent. *Schneckloth*, 412 U.S. at 229, 231. Factors relevant to voluntariness include but are not limited to: (1) the consenter's age, education, past experiences, and intelligence; (2) whether the police officers informed the consenter of his constitutional right to refuse consent; (3) the length and conditions of the consenter's detention and/or questioning; and (4) law enforcement's use of any inherently coercive tactics. *Vanvliet*, 542 F.3d at 264 n.2. Consent may be invalidated if an illegal act tainted it by significantly influencing the defendant to give consent. *See, e.g.*, *Pagán-González v. Moreno*, 919 F.3d 582, 596 (1st Cir. 2019) ("a law enforcement officer's false claim of authority or lies conveying an exigent need for the search" may violate the Fourth Amendment); *see also United States v. Delgado-Pérez*, 867 F.3d 244, 256–57 (1st Cir. 2017).

Kalme claims that Cintrón searched the vehicle with consent. Cintrón made no mention of searching the vehicle before Kalme joined him and the defendants at the vehicle. They do agree, however, that Kalme requested consent to search the vehicle, that Cintrón or Kalme requested consent for a K-9 search, and that Mercado also requested consent to search with Fuhrer. Jairo consented to the search each of three times. There was neither an overwhelming number of officers nor an overwhelming show of force. Kalme and Cintrón wore their pistols at their waists and did not remove them from their holsters or brandish them in any way. They wore or showed law enforcement credentials. Kalme testified that he did not see Cintrón raise his voice at the defendants and that his own chat with them was calm. There is no evidence in the record that force or intimidation played a role in gaining consent, nor is there evidence that either defendant withdrew his consent at any time during the stop. Moreover, Defendants have not advanced an argument that Kalme, Cintrón, or Mercado falsely claimed to have a warrant, claimed that a search would

occur regardless of their response, or stated that an emergency required a search. Accordingly, the court should find that the K-9 search occurred with Defendants' consent.

Defendants also argue that the delay in the K-9's arrival unreasonably prolonged the stop, should have vitiated consent, and transformed the stop into an unconstitutional seizure. Dkt. 87 at 23–24. The government responds that the law enforcement officers had reasonable suspicion of criminal activity based on their investigation, which justified prolonging the traffic stop. Dkt. 88 at 12. The Supreme Court has held repeatedly that a lawful traffic stop may become unlawful if it prolonged beyond the time reasonably required to complete the stop's purpose. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614–15 (2015). Cintrón eventually issued two tickets, so the stop's duration should not have exceeded the amount of time reasonably needed for ordinary traffic infractions. A dog sniff "is not an ordinary incident of a traffic stop," so it may not add time to the stop, though an officer may prolong a stop if there is reasonable suspicion of criminal activity that justifies it. *Id*. at 1614–16. Courts gauge the reasonableness of the prolonged stop's duration by "whether the officers were 'diligently pursu[ing] a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *United States v. Rasberry*, 882 F.3d 241, 248 (1st Cir. 2018) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

There are two inquiries: was there reasonable suspicion to prolong the stop, and did the duration exceed the time necessary for officers to confirm or dispel their suspicions. Reasonable suspicion is the "touchstone for an initial stop." *United States v. Gates*, 709 F.3d 58, 62 (1st Cir. 2013) (citing *United States v. Ruidíaz*, 529 F.3d 25, 28 (1st Cir. 2008)). Reasonable suspicion "deals with degrees of likelihood, not with certainties or near certainties" and allows "police officers to draw upon their experience and arrive at inferences and deductions that may well elude an untrained person." *United States v. Arnott*, 758 F.3d 40, 44 (1st Cir. 2014). Reasonable suspicion is based on the totality of the circumstances, and acts that might be innocent alone may, in concert, give rise to

reasonable suspicion. *Arvizu*, 534 U.S. at 274; *United States v. Sokolow*, 490 U.S. 1, 9 (1989). A court looks to the totality of the circumstances to determine whether or not the officer had "'a particularized and objective basis for suspecting legal wrongdoing.'" *Gates*, 709 F.3d at 62 (quoting *Arvizu*, 534 U.S. at 273).

Here, Kalme and Cintrón had both reasonable suspicion and consent to search. Initially, the SOI's tip was borne out almost exactly. Melendez and Rios had observed two men with Dominican accents who fit the SOI's description, working in the prow of a white yawl. The vessel was in the vicinity of a black Lincoln SUV at a residence in the neighborhood the SOI had mentioned. A Lincoln with a matching license plate and the vessel were then observed in Fajardo on the morning that the SOI said it would be. The vessel was additionally seen exiting the water, implying that someone had taken it out on the water, and the SUV was parked behind a business rather than out in the open in the parking lot. Javier even told Cintrón that they had taken the vessel out of the water that morning and planned to return to San Juan. Kalme thought Defendants looked shaky and nervous. Cintrón had not yet issued the traffic tickets when the K-9 unit arrived. Javier gave consent three times, including to the K-9 handler when he arrived. All of these factors weigh in favor of strong reasonable suspicion of criminal activity.

Turning to the second question, the reasonableness of the duration is a fact-specific inquiry. The K-9 unit arrived somewhere between three and fifteen minutes after the stop began. Cintrón testified that Kalme joined him at the vehicle three to five minutes after the stop began, and the dog arrived as Cintrón and Kalme were about to begin searching the car. Kalme testified that he joined Cintrón when the K-9 unit arrived, fifteen minutes after the stop began. Defendants, adopting the longer of the two timeframes, contend that the delay was *per se* unreasonable, but *Rodriguez* does not offer the support for which they cite

it.[3] Dkt. 87 at 23. The First Circuit has held that a three-minute dog sniff was well within the range of acceptable durations to test growing suspicion of criminal activity during a traffic stop. *United States v. Favreau*, 886 F.3d 27, 30–31 (1st Cir. 2018). The Supreme Court found constitutional a ten-minute traffic stop in which a K-9 search was performed around the car's exterior despite the driver's refusal to consent because the search neither prolonged the stop nor implicated legitimate privacy interests. *Illinois v. Caballes*, 543 U.S. 405, 409–10 (2005). Finally, the First Circuit found a forty-minute stop—thirty minutes of which were spent waiting for the K-9 unit to arrive, reasonable under the circumstances. *United States v. Sowers*, 136 F.3d 24, 25–26, 28 (1st Cir. 1998).

The First Circuit found that questioning a suspect for ten to fifteen minutes where police had some suspicion that he was connected to a crime was within reasonable bounds. *United States v. Velez-Saldana*, 252 F.3d 49, 52 (1st Cir. 2001). In *Velez-Saldana*, the police made a *Terry* stop based on "a criminal incident, an isolated location, an unfamiliar face, and a coincidence of time and location," *Id.* They had "nothing at the outset that *directly* linked Velez-Saldana with the crime." *Id.* In *Trueber*, the First Circuit found reasonable an investigatory stop that lasted fifteen minutes which included the consent search of the suspect's suitcase. *United States v. Trueber*, 238 F.3d 79, 94 (1st Cir. 2001).  In another, non-canine-involved stop, the Supreme Court found that a twenty-minute investigatory detention was reasonable because the police spent that time diligently working to confirm or dispel their suspicions. *Sharpe*, 470 U.S. at 686.

Cintrón, upon pulling the vehicle over, approached and began speaking with Javier and asking questions. They had a conversation about the lack of vehicle registration, and Cintrón prepared two tickets for traffic infractions. Ex. 16; Ex. 17. Kalme at first remained in his car and arranged for the K-9 unit to join them. When Kalme joined Javier and

---

[3] In *Rodriguez*, the Supreme Court vacated and remanded a case in which the Eighth Circuit found a seven- or eight-minute delay permissible because there was no finding as to whether the officer who made the stop had reasonable suspicion to justify extending the otherwise completed traffic stop. *Rodriguez*, 135 S. Ct. at 1614.

Alvarez, he spoke with the men and learned information that corroborated the SOI tip. Both secured permission to search the vehicle. Based on the testimony, it seems unlikely that these activities absorbed fifteen minutes, but it does appear that Kalme and Cintrón spent whatever time passed attempting to further their investigation and determine whether they had located the targeted vehicle and vessel. The tipping point is the strength of the evidence supporting reasonable suspicion and Javier's threefold consent.

The government contends that Javier's consent to the dog sniff was not time-restricted and that consent should negate any delays in waiting for the K-9 unit. Defendants respond that there can be no such waiver and imply that the delay constituted a warrantless seizure. Dkt. 87 at 23. The only testimony on whether Defendants were free to leave came from Cintron, who stated that they could have left when the intervention was complete if it had been a normal intervention. Dkt. 87 at 23 (citing transcript). The length of an intervention, however, does not convert a stop into an arrest. *Rasberry*, 882 F.3d at 248. The consent to search is no panacea, but, in this case, it supports a fifteen-minute stop as reasonable under the circumstances. Accordingly, the stop and dog sniff were not unreasonable under the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, the motion should be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

United States v. Javier-Jazmin, Criminal No. 17-126 (ADC/BJM)                    22

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 16th day of August 2019.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge