### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Crim. No. 17-126 (ADC)** |
| **[1] OSCAR JAIRO JAVIER-JAZMIN,** | |
| **[2] WILSON ALVAREZ-BARRERA,** | |
| **Defendants.** | |

### OPINION AND ORDER

Before the Court is defendants Oscar Jairo Javier-Jazmín and Wilson Álvarez-Barrera's (collectively "defendants") Objections ("objections") to the Report and Recommendation (R&R) entered by United States Magistrate Judge Bruce J. McGiverin ("Magistrate Judge"). **ECF Nos. 89, 97**.

For the following reasons, the Court **ADOPTS** the R&R at **ECF No. 89** and **OVERRULES** defendants' objections at **ECF No. 97.** Accordingly, the motion to suppress at **ECF No. 36** is **DENIED.**

### I.    Factual Background

On March 1, 2017, defendants were indicted by a Grand Jury and charged with one count of possession with intent to distribute controlled substances. The charged offense is in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A)(ii) and Title 18, United States

Code, Section 2. Defendants filed a motion to suppress. **ECF No. 36**. The government responded.

**ECF No. 43**. The Court referred the matter to the Magistrate Judge for a R&R. After an

evidentiary hearing, the parties filed post-hearing briefs. **ECF Nos. 87, 88**.[1] The Magistrate Judge

issued a R&R recommending the Court **DENIES** defendants' motion at **ECF No. 36** requesting

suppression. **ECF No. 89**. Defendants filed objections. **ECF No. 97**.

The charges stem from a tip provided by a source of information ("SOI") on February 9,

2017.[2] The SOI alerted authorities of a drug smuggling operation. According to the SOI, a white

vessel (yawl with one outboard engine) would travel from Fajardo, Puerto Rico to St. Thomas,

U.S. Virgin Island to pick up 50 kilograms of contraband. **ECF No. 89** at 2. The vessel would

then return to Fajardo with contraband stashed in a hidden compartment. *Id*. The timeframe of

the transaction would span from Friday, February 10, 2017, at approximately 6:00 p.m. to

Saturday, February 11, 2017, at approximately 9:00 a.m. when the white vessel was supposed to

return to Fajardo. *Id*. "The SOI described the individuals [participating in the transaction] as

being of Dominican descent: one was skinny and dark-skinned ("trigueño") with dreadlocks,

and the other was chubby and dark-skinned ("trigueño"), also with dreadlocks." *Id*. "The SOI

stated that they would use a black Lincoln SUV to tow the vessel." *Id*. The SOI provided

---

[1] Over the course of the evidentiary hearing, the government presented the following witnesses: Puerto Rico Police Department ("PRPD") agent Peter Kalme ("Kalme"), who is attached to the Drug Enforcement Administration ("DEA") Task Force, U.S. Customs and Border Protection, agent Roymi Nieves ("Nieves"), PRPD Officer Omar O. Meléndez-Maldonado ("Meléndez"), who is attached to the DEA Task Force, agent Héctor Cintrón-Colón ("Cintrón"), who works for Rapid Action United Forces ("FURA"), and PRPD Officer Alberto José Rivera-Ortiz ("Rivera"), who directs the PRPD canine division (generally and collectively the "agents").

[2] The SOI "had worked with other police officers before[.]" **ECF No. 89** at 2.

information of the place where the vessel was stowed. The property is located in Barrio Obrero, Puerto Rico ("property") and includes three separate structures in its interior.

On February 9, 2017, the agents drove by and took photographs from the main thoroughfare (Avenida Eduardo Conde) but did not enter the property. *Id* at 3-4. On February 10, 2017, the agents entered the property through an open gate and made observations and took additional pictures with their cellphones from the inside of their motor vehicle. *Id* at 4-5. The events that transpired that day are detailed further below in this Opinion and Order.

On February 11, 2017, agents pulled over the black Lincoln SUV and the attached vessel for a traffic violation (missing red taillight). Defendant Javier-Jazmín, the driver, verbally consented to the search of the vehicle and the vessel on three occasions during the traffic stop. Defendants also consented to a search by a K-9 unit. *Id* at 6-11. Contraband was found on the vessel. *Id*. Defendants were arrested and, once they were taken to the authority's headquarters, they signed consent forms for the search of the vehicle and the vessel. *Id* at 11.

Defendants concede that review of the R&R's findings of fact warrant a clear error review, while the conclusions of law are susceptible to *de novo* review. **ECF No. 97** at 10. In their objections, defendants do not challenge the Magistrate Judge's findings of fact or credibility assessment. Moreover, other than highlighting specific extracts of the hearings' transcripts, defendants' narrative does not deviate in any substantial way from the R&R's factual findings. Rather, defendants "object to the legal determinations of the Magistrate Judge." **ECF No. 97** at

2. For purposes of clarity and precision, the Court will discuss the specific facts of the case while addressing each of defendants' objections herein.

## II.   Standard of Review

The District Court may refer pending criminal motions to a Magistrate Judge for entry of a report and recommendation. 28 U.S.C. §636(b)(1)(A); Fed.R.Crim.P 59(b)(1). An adversely affected party may file written objections to the report and recommendation within fourteen days after served with the same. 28 U.S.C. §636(b)(1)(C).  A party is entitled to a *de novo* review of "those portions of the report . . . to which specific objection is made."  *Sylva v. Culebra Dive Shop*, 389 F.Supp. 2d 189, 191-92 (D.P.R. 2005) (citing *United States v. Raddatz*, 447 U.S. 667 (1980)).

"Absent objection by [the adversely affected party], [a] district court ha[s] a right to assume that [the affected party] agrees to the magistrate's recommendation." *M. v. Falmouth Sch. Dep't*, 847 F.3d 19, 25 (1st Cir. 2017) (citing *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir. 1985), cert. denied, 474 U.S. 1021 (1985)). Thus, "a party's failure to assert a specific objection to a report and recommendation irretrievably waives any right to review by the district court and the court of appeals." *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 (1st Cir. 1998).

## III.   Discussion

Defendants' objection at **ECF No. 97** is threefold. First, defendants challenge the legality of the agents' February 10, 2017 "intrusion into private property to investigate." **ECF No. 97** at 16. Second, defendants claim that the traffic stop conducted by the agents on February 11, 2017 was a pretext in order to perform an unconstitutional-warrantless search. *Id* at 21. Finally,

defendants argue that the consent to search the vessel provided by defendants is fruit of the poisonous tree as it resulted from the illegal intrusion into private property. *Id* at 28. The Court will introduce the relevant background and address each argument in turn.

### A.      Agents' intrusion into private property

Defendants' first and primary objection hinges on the agents' "intrusion into private property to investigate" the statements provided by the SOI. **ECF No. 97** at 16. They claim that the agents' search ran afoul the Fourth Amendment protections. Consequently, they argue, the search of the property poisoned all information thereafter obtained by the agents, which eventually led to the vessel where contraband was later on found. *Id*.

### (i)      Defendants' expectation of privacy

The R&R flagged defendants' silence as to their expectation of privacy within the Barrio Obrero property. The Magistrate Judge explicitly stated that "[t]here was no testimony at the suppression hearing regarding who owned the property in question, who lived at the property in question, or the Defendants' relationship to the property in question." **ECF No. 89** at 12. "Such information is integral to a reasonable expectation of privacy analysis because the reasonableness of one's expectations varies with ownership, tenancy, duration of stay, commercial versus residential purposes and so on." *Id* at 12. The Magistrate Judge therefore concluded that defendants "never established a reasonable expectation of privacy, the court should find that agents did not violate the Fourth Amendment by entering the property." *Id* at 13.

Defendants did not address this issue in their objections at **ECF No. 97**. Instead, defendants argued that the agents entered private property without "information of the [property's] dwellers." **ECF No. 97** at 17. In doing so, defendants failed to address head-on the question of whether they harbored any expectation of privacy, and on what grounds, if any at all. **ECF No. 97** at 17. Eschewing the expectation of privacy concerns noted by the Magistrate Judge, defendants hold "no one could have taken the pictures upon which the [g]overnment's case hinges without infringing the property's curtilage." **ECF No. 97** at 20. Once again, however, defendants failed to explain what expectation if any, they had with regards to the property's curtilage.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In *U.S. v. Stokes*, 829 F.3d 47, 51 (1st Cir. 2016), the First Circuit Court of Appeals explained that

> the **defendant carries the burden of making a threshold showing that he has 'a reasonable expectation of privacy in the area searched and in relation to the items seized**.' *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988). Only then can he 'challenge the admissibility of evidence on fourth amendment grounds.' *United States v. Gómez*, 770 F.2d 251, 253 (1st Cir. 1985). 'This burden must be carried at the time of the pretrial hearing and on the record compiled at that hearing.' *Aguirre*, 839 F.2d at 856. (emphasis added).

Defendants failed to make the required threshold showing of expectation of privacy within the property. Notably, they dodge the specific threshold issue in their objections at **ECF No. 97**. Thus, defendants' argument claiming that the agents' investigation "befouls" Forth

Amendment seems to seek relief on behalf of unknown third parties. For these reasons, defendants' request for relief under the Fourth Amendment is unwarranted.

However, even if the Court assumed, for argument purposes, that defendants met their burden and proffered a minimal showing of expectation of privacy or standing, which they did not, the Court would nonetheless reach a similar conclusion.

### (ii)   Curtilage

The court will now turn to the specific facts of this case in order to address defendants' first argument, assuming they had an expectation of privacy to so claim, which they failed to establish or even suggest.

The property herein alluded is next to two housing projects. It is adjacent to a main thoroughfare ("not wide") which has no place to park. **ECF No. 89** at 2. "The property is separated from the sidewalk and street by a gate and a fence made of concrete and galvanized steel." *Id*. "Three structures are on the property: two are on either side of a short, unpaved driveway, and the third is at the end of the road. To knock on the door of any structure, you must pass through the gate." *Id.*

According to defendant, on February 9, 2017, agents Meléndez, Ríos, and the SOI drove-by the property. They noticed two boats akin to the vessel described by the SOI inside the property. **ECF No. 97** at 2-3. *Id*. The agents ruled out the possibility of establishing surveillance because someone from the nearby housing projects could have targeted the unmarked, heavily tinted vehicle they were driving. However, they were able to take photographs from the main

thoroughfare with one of the agent's cellphone. The photographs depict the registration number of one of the vessels (7097HH) and the prow of the second vessel. *Id* at 3. The agents discussed their findings of their February 9, 2017 drive-by with agent Kalme. *Id* at 4. A search of the vessel's visible registration number revealed that the vessel was registered under the name of Angélica Carrasquillo Collazo. **ECF No. 89** at 3.

The next day, February 10, 2017, agents Meléndez and Ríos once again returned to the property. From the main thoroughfare and through the fence's openings, they were able to notice a large black sports utility vehicle ("SUV") inside the property. The gate to the unpaved driveway onto the property was open.[3] The agents went through the gate driving an unmarked vehicle. **ECF No. 97** at 4. Once inside, from inside their car, the agents spotted the black SUV matching the SOI's description, which foretold that a black SUV would be used to tow the vessel with the contraband. **ECF No. 97** at 4-5. Without leaving the car, one of the agents was able to see the SUV's license plate number: GAG-532. *Id* at 5. In that moment, the agents sighted two males working on one of the vessels. *Id*. To avoid any suspicion, the agents rolled down the car's window and asked the two men for fake directions. *Id*. The agents left the property at once.

The two individuals matched the description provided by the SOI of the persons that would participate in the drug transaction.[4] The agents shared their observations and information with agent Kalme. *Id*. Agent Kalme sent an email compiling the information and

---

[3] **ECF No. 89** at 3-4. Defendants did not include this fact in their narrative. However, they failed to raise any issue with this finding.

[4] "Two dark skinned Dominican national with braided hair." **ECF No. 97** at 2.

photographs obtained by the agents on February 9th and 10th. Agent Kalme shared the email with United States Customs and Border Protection, the Coast Guard, and others. **ECF No. 89** at 5.

As stated before, defendants did not challenge any of the findings of facts contained in the R&R. Instead, defendants objected by generally claiming that the agents "intru[ded] private property." **ECF No. 97** at 16. Defendants contend that because the agents entered the property without a warrant all their observations are all fruits of the agents' unconstitutional access into curtilage without "consent of its occupants." *Id* at 17. Ultimately, defendants seek suppression of all information obtained from the agents' intrusion into "private property" as it "befouls Fourth Amendment protections." *Id*. **ECF No. 97**.

Under *United States v. Dunn*, 480 U.S. 294 (1987), four factors must be evaluated to determine whether an area surrounding a house is "curtilage": (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by."

The First Circuit Court of Appeals in *U.S. v. Smith*, 919 F.3d 1, 13 (1st Cir. 2019), *cert. denied,* 140 S. Ct. 203 (2019), noted that "given that [defendant] was working in a pecan field when the agents first encountered him, the area was 'not being used for intimate activities of the home.'" *Id.* (citing *United States v. Dunn*, 480 U.S. at 302). Here, defendants were doing

something inside the boat at the time the agents entered the property. The vessel was parked right next to the driveway.

Here, due to defendants' failure to make a minimum showing of expectation of privacy, the record does not support a determination as to whether the driveway can be considered as defendants' home or curtilage protected by the Fourth Amendment. Considering that it is defendants' burden to make "a threshold showing that he has 'a reasonable expectation of privacy in the area searched[,]" the Court finds that the defendants cannot seek Fourth Amendment suppression of information obtained by the agents in the driveway grounded on a breach of "curtilage" theory. *U.S. v. Stokes*, 829 F.3d at 51. Much like in *Smith*, even if the driveway could be considered curtilage in other cases, defendants "did not [claim they] live in that residence and [did] not claim to have conducted any [protected] activities there. Thus, from this record it is reasonable to conclude that the [driveway] was not curtilage as to [defendants] and that [they] may not contest the agents' entry there." *Id.,* n.7.

### (iii)    Implied license

Defendants also argued that the implied license doctrine precluded the agents from searching the premises. They are mistaken.

Generally, all persons have an implied license to enter property and knock on a homeowner's door. *Kentucky v. King*, 563 U.S. 452, 469 (2011). However, as defendants argue throughout their objections, "the scope of [the] license ... is limited not only to a particular area but also to a specific purpose." *United States v. Bain*, 874 F.3d 1, 12-13 (1st Cir. 2017) (quotation

marks, alteration, and citation omitted). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Florida. v. Jardines*, 569 U.S. at 8. "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id* (citing *Kentucky v. King,* 563 U.S. 452 (2011)). Defendants argue that the agents could not conduct a search because the purpose of the implicit license doctrine is limited to a "knock and talk." **ECF No. 97** at 20.

However, the Court need not reach a determination as to defendants' implicit license argument. Considering the fact that defendants do not claim to be owners, occupants, residents, guests or having any expectation of privacy whatsoever at the property at the time the agents entered the driveway, they are precluded from questioning whether or not the agents' observations fell short of implied-license parameters.

Assuming for argument's sake that defendants claimed to have an expectation of privacy to trigger Fourth Amendment protection, the Court would nonetheless deny defendants' arguments under this doctrine. Via objections, defendants pointed out that the Magistrate Judge should have applied the four-factor test established in *U.S. v. Dunn*, 480 U.S. at 301 before concluding that the warrantless search was not unconstitutional. Defendants contend that the Magistrate Judge should have determined that the "driveway was intimately tied to the home itself and should be considered part of the curtilage." **ECF No. 97** at 19. They argue that although the driveway was visible from the main street, the "ability to observe… is not the same as the

right to enter." *Id*. "[A]ssuming implied license was not revoked by the gate and fencing," defendants conclude, the implied-license exception is not applicable in this case because the agents did not comply with the knock-and-talk requisite. **ECF No. 97** at 20. Finally, quoting *Florida v. Jardines*, 569 U.S. 1 (2013), defendants argued "knock and talk doctrine does not authorize agents to 'stand in a home's porch or side garden and trawl for evidence with impunity.'" *Id*. These arguments miss the mark.

In *Florida. v. Jardines* the Supreme Court set forth several considerations to distinguish between a "customary invitation" and a search that falls outside the invitation limits for purposes of the implied license test. The Supreme Court explained "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that." *Id* at 9 (emphasis omitted). Moreover, "[t]o find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police." *Id*. These scenarios, however, are significantly different from the facts of this case.

Here, the property is not a typical, single living unit with surrounding curtilage. The property includes three different structures with an undetermined number of separate living units all of which share the short, unpaved driveway and the gate. The property is enclosed with a fence, which any person could see through because it was partly built with galvanized steel

with openings. On their second drive-by, on February 10, 2017, the agents were able to see part of a black large SUV from the main street. **ECF No. 77** at 75. The gate was **open** to any traveler. Upon entering the driveway, the agents saw the large black SUV at the left side of the driveway partially shield from the street by the structure in the left. **ECF No. 89** at 4. The vessel in which the two men were working was on the right side of the unpaved driveway next to the structure on the right side. **ECF No. 77** at 78-79; **72-15**. The agents never stepped outside the vehicle or drove outside the short driveway. **ECF No. 89** at 4.

From the pictures available in the record, the Court is unable to tell the specific length of the driveway. However, the evidence clearly shows the driveway is short enough to be traveled on foot in a couple of seconds and in even less time aboard a slow-moving motor vehicle. **ECF No. 72-15**. Since the driveway serves the three structures, any person intending to knock on the door of any of the tree structures would necessarily step over and walk through the shared driveway. Moreover, because there is only one path from the street to the building structures, each resident or occupant (unknow to the Court) must tolerate the intrusion of any of the other occupant's visitors.

In light of all the above, the Court agrees with the Magistrate Judge's determinations and finds that agents did nothing more than observe and take pictures with their cellphones of objects in plain view. Since they never stepped out of the vehicle, the agents did not peek through any window or look behind concealing tarps, as the references cited by defendants would suggest. When spotted, the agents asked defendants for directions and then left the

property. Even if defendants were to argue that the agents' actions could amount to a "search," their actions can certainly not be compared to "exploring… with a metal detector, or marching [a] bloodhound into the garden before" asking defendants for directions. *Florida v. Jardines*, 569 U.S. at 9. Therefore, defendants' arguments under *Florida v. Jardines* are unavailing.[5]

Finally, as to defendants' claim that the fence and gate constituted exterior signs that revoked any implied license to enter the property, the Court is convinced that in this case the evidence shows otherwise. Addressing the implied license question *in arguendo*,[6] in *Smith* the Court of Appeals for the First Circuit considered the locked gate to be a symbol of intention to revoke any notion of implied license to enter. *See Smith*, 919 F.3d at n.6. Here, however, the gate to the driveway was open. Moreover, as discussed before, the gate and fence were shared by three separate structures or buildings. The road leading to all three of these structures (and the vessel in which defendants where standing) was open to anyone coming from the main street.

As to specific actions of the agent inside the driveway, the Court notes that the agents did not even reach the porch or doorsteps of any of the structures close enough to knock on any

---

[5] The facts of the case *U.S. v. Alexander*, 888 F.3d 628 (2nd Cir. 2018) cited by defendants in their objections are also distinguishable and therefore unconvincing. To wit, in *U.S. v. Alexander* the defendant "lived in a narrow house on Staten Island. The front of the house faced the street, and a short set of stairs led directly from the sidewalk to the front door. The property also included an 84-foot-long driveway that ran perpendicular to the street and alongside the home. **The driveway extended past the back of the house, and at the end of the driveway, in the backyard, was a shed. Alexander used the part of the driveway in front of the shed for parking, barbeques, and relaxation.** There was fencing on three sides of the property, though not on the side facing the street." *U.S. v. Alexander*, 888 F.3d 628, 630 (2d Cir. 2018)(emphasis added).

[6] "[W]e do not resolve this question today, as we assume arguendo that the locked gate revoked the implied license of entry." *U.S. v. Smith*, 919 F.3d 1, 10 (1st Cir. 2019).

door nor did they talk to any occupant other than defendants, which, in this Court's opinion, would have been a much more intrusive method than merely taking photos from the car. In addition, the Court highlights the fact that defendants were on the vessel, parked in an open area in the property. While this Court recognizes that under a different set of circumstances a fence and an open gate could still serve as an exterior sign revoking any implied license, the underlying facts of this case (unchallenged by defendants) and the evidence on the record tilt the scale in the opposite direction.

### (iv)    Reasonableness of the February 10, 2017 search

The scope and intrusiveness of the search is a recognized factor in the test for reasonableness. *See U.S. v. Owens*, 917 F.3d 26, 36–37 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 200 (2019). "Th[e] application of 'traditional standards of reasonableness' requires a court to weigh 'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.'" *Maryland v. King*, 569 U.S. at 448 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). In *Owens*, given the nature of the crimes investigated and the potential of vanishing evidence, the agents stepped on the defendant's unenclosed driveway to verify the temperature of defendant's vehicle. The Court held that "its intrusiveness was minimal—[the law enforcement agent] simply placed his hand on the vehicle's hood and grill for a few seconds." *U.S. v. Owens*, 917 F.3d at 37.

In this case, the agents entered through an open gate. They stayed on the driveway and never stepped out of the car. Consequently, they did not touch or see anything that was not

available in plain view. Aside from the cellphone's camera, the agents did not use equipment to enhance their sight. Instead, the agents saw defendants from the driveway. Once they noticed the two men on the vessel, which was parked right next to the driveway, the agents were able to establish verbal communication with the individuals from within the car by rolling down the window.

The Court also notes that the pictures defendants seek to suppress do not depict any area of the interior of the SUV, the vessel, or any of the structures. Furthermore, the pictures do not show any human presence or profile. The only information contained in the photographs relates to the make, model and color of the SUV as well as the license plates of the vessels. Moreover, some of this information was visible and readily available to anyone walking down the main public road parallel to the property's gate. That is, all the photographs were taken either from the main public street through the fence's openings or from within the car inside the driveway open to the public.

The agents' interaction with the defendants is also revealing. Even though the two men working on the vessel matched the description provided by the SOI, the agents did not ask anything related to the investigation nor did they elicit any information that would corroborate the SOI's tip or in any other way advance the investigation. To the contrary, the agents simply asked for fake directions as an excuse to leave the place. According to the evidence, the agents were forced to engage in minimal conversation in order to avoid raising any suspicion. Other

than that, defendants do not contend the agents made any remarks or posed any questions related to the investigations or eliciting any information from them.

Moreover, since defendants failed to assert any degree of expectation of privacy within the property and the government's interest in preventing the criminal activity described by the SOI, the Court finds that the government's intrusion, even if warrantless, was minimal and reasonable. "The scope and intrusiveness of [the agent]'s search also weigh in favor of its reasonableness." *U.S. v. Owens*, 917 F.3d at 36 (holding as a "minimal intrusion" the placement of the officer's hands in the motor vehicle's hood to verify the temperature even though the vehicle was parked in the "driveway").

**B.      Traffic stop**

Defendants raise several arguments related to the events that took place after the agents' observations and investigation within the property. To properly address each argument, the Court will summarize the relevant facts as stated in the R&R, which is factually unchallenged.

As previously discussed, agent Kalme reduced to writing all the information provided by the SOI, the information stemming from the February 9, 2017 drive-by, and the February 10, 2017 drive into the property's driveway. The information was then relayed via email to several members of both local and federal law enforcement agencies, including agent Nieves.

While driving on Puerto Rico state road number 3, on February 10, 2017, agent Nieves spotted the vessel described in agent Kalme's email heading east bound. *Id*. After doublechecking the information in the email, agent Nieves made a maneuver to get a "good

look" at the vehicle and vessel. *Id*. But agent Nieves was only able to see number "70" on what he supposed was the vessel's registration plate. *Id* a 7. He then called agent Kalme to inform him of the sighting. **ECF No. 89** at 6-7.

As foreshadowed by the SOI, on the morning of February 11, 2017, agent Kalme found the black Lincoln SUV with an empty trailer in Las Croabas, Fajardo. *Id*. After giving instructions to other agents, agent Kalme positioned himself in a spot where he knew the SUV would have to go through to if the vehicle was to head back to the Barrio Obrero property. *Id*.

On or around 7:15 or 7:30 a.m., agent Nieves saw the vessel coming out of the water at the Las Croabas' boat ramp in Fajardo. *Id* at 7. At that point, he was able to corroborate that the registration number on the vessel matched the number in agent Kalme's emailed and that it was the same vessel he saw the day before on the highway. *Id*. He saw one person hitching the vessel to the vehicle, whom he described as having dark skin, and assumed a second person had to be around to help get the boat out of the water. *Id*. Agent Nieves called agent Kalme to inform him that the vessel was in-land and being towed away from Las Croabas by the black Lincoln SUV. *Id*.

Agent Kalme and his partner spotted and tailed the Lincoln SUV hauling the vessel heading west. Agent Kalme noticed that the trailer was missing a taillight. *Id* at 7. Agent Kalme testified that he called FURA officers to pull over the vehicle for the missing taillight, which constitutes a traffic infraction. *Id* at 7. Agent Cintrón took a marked vehicle, drove down the highway, and spotted the Lincoln SUV with the vessel. *Id* at 7. Agent Cintrón noticed that the

vessel's trailer had a broken red reflector light. *Id* at 7-8. Agent Cintrón pulled the vehicle over because of that traffic infraction. Agent Cintrón was unaware that agent Kalme pulled over behind him. *Id* at 8.

Two men were inside the black SUV. *Id* at 8. The driver and the passenger were later identified as Oscar Javier-Jazmín and Wilson Álvarez-Barrera. Agent Cintrón asked for the driver's license and vehicle's registration. *Id* at 8. The driver provided his license but was not able to provide the registration papers. *Id* at 8. At that point, unaware agent Kalme was parked behind him, Agent Cintrón thought he was alone with the defendants. Out of concern for his safety, he asked both the driver and passenger to step out of the vehicle and stand near the hood. *Id* at 8. They both complied. Agent Cintrón did not see anything or smell any scent that would have raised a reasonable suspicion of illegal activity inside the SUV, aside from the taillight infraction.[7] *Id.* at 8.

Agent Kalme walked over to approach agent Cintrón. Agent Kalme kept his DEA credentials in a black wallet, which he showed to the driver and passenger. *Id* at 9. Agent Cintrón asked for consent to search the vehicle and the vessel. Defendants agreed to both. *Id*. Agent Kalme also asked for consent to search the vehicle and vessel. *Id*. Once again, defendants

---

[7] The Magistrate Judge identified two discrepancies within the testimonies of the events that followed. First, the Magistrate Judge pointed out that, although Agents Kalme stated that Cintrón searched the vehicle and obtained permission for a K-9 unit search, during his testimony Agent Cintrón did not mention conducting a search or securing consent for a K-9 search during his turn. The second discrepancy highlighted by the Magistrate Judge relates to the timing in which Agent Kalme joined Cintrón and other officer in the cruiser that made the original stop. The Court finds these discrepancies to be immaterial for purposes of the discussion herein.

consented to both. *Id*. Defendants also consented to a search by a K-9 unit of the vehicle and the vessel. *Id*. Agent Kalme testified that he noticed the driver and passenger were acting "shaky" and nervous. *Id*.

Agent Joel Mercado ("Mercado"), a K-9 officer with the PRPD, and his canine, Fuhrer, arrived at the scene just as agents Kalme and Cintrón were about to begin the search. *Id*. Agent Cintrón informed agent Mercado that defendants gave their consent to a search of the vehicle and of the vessel. However, agent Mercado also asked for defendants' consent to search both the vehicle and the vessel with the K-9 unit. *Id*. Defendants consented. *Id*. No one drew a gun during these events. Defendants never withdrew their verbal consent. *Id*.

After searching the vehicle, Fuhrer was placed on the vessel. Fuhrer sat near the prow of the vessel. *Id* at 10. The parties stipulate that contraband was found on the vessel.

Agent Cintrón issued two Puerto Rico Law 22 traffic tickets one for the taillight infraction and the other one for the missing registration papers. *Id*. Agent Kalme "mirandarized[,]" arrested, and transported defendants to the HIDTA offices in Fajardo along with the vehicle and the vessel to get out of harm's way. *Id* at 11. At the HIDTA offices, defendants received copies of the Drug Enforcement Agency's ("DEA") form 13B. *Id*. Defendants signed and initialed the forms but declined to continue with the interview. *Id*. Defendants also signed a consent form to search the vehicle and the vessel. *Id*.

Defendants argue that when an "officer stops a driver based upon statements provided by a [SOI], probable cause is irremediably linked to the corroboration of any illegality described

by the informant… In that sense, this is a straight-forward lack of probable cause case." **ECF No. 97** at 22. Because the agents did not initially find illegal activity that corroborated the SOI's tips, defendants contend, "[the agents] manufactured a nonexistent pretextual traffic infraction to stop defendants' vehicle to conduct a search under false pretenses." *Id.,* 24. In support, defendants assert that the agents admitted that the traffic stop ensued to corroborate the SOI information. *Id.,* at 25. Under these circumstances, defendants argue that "[a] traffic stop for an administrative infraction only authorizes a brief encounter" while "a canine intervention, on the contrary, is generally beyond the scope of a traffic infraction[.]" *Id.,* at 27-28. Finally, defendants posit that the detention and the K-9's search took three times "the time that a traffic stop would normally entail" making the stop and search unreasonable "per se." *Id*. The Court disagrees.

Notably, defendants jump directly to the question of whether the "search" was lawful. In doing so, defendants sidestep the threshold question: whether the "traffic stop" was lawful. **ECF No. 97** at 21-24.

A traffic stop is generally reasonable if a law enforcement officer has probable cause to believe that a traffic infraction occurred. *See Whren v. United States*, 517 U.S. 806, 810, (1996). Here, "Cintrón pulled the vehicle over after he observed a violation of Law 22: the light on the back of the vehicle lacked a red plastic covering." **ECF No. 89** at 16. Defendants do not challenge that determination or the fact that the driver failed to produce the vehicle's registration, which according to the record constitutes a separate traffic violation.

Defendants address the traffic infraction late in their arguments by merely contending that the agents "manufactured a nonexistent pretextual traffic infraction to stop defendants to conduct a search under false pretenses." *Id.,* at 24. But defendants point to no evidence of what was it that the agents allegedly manufactured nor do defendants even suggest any theory to refute the fact that the trailer had a broken taillight. The testimony credited by the Magistrate Judge is supported by photographs evincing the trailer's lack of a red break taillight. **ECF No. 72-3**. Thus, all of defendants' arguments standing for the proposition that the agents stopped the SUV in order to corroborate the SOI's tip are groundless because the stop was justified by the unchallenged traffic violations. *See* **ECF No. 97** at 22.

Defendants mischaracterized agent Cintrón's testimony to argue that he "recognized" that the vehicle was detained only "to corroborate the statements by the SOI." *Id* at 25. However, that is not the case. Agent Cintrón did not testify that he stopped the SUV to corroborate the SOI's tip, what he said was that if it were not for the SOI's tips, he would have let defendants go after issuing the tickets for the traffic violation. **ECF No. 97** at 25.

But even if agent Cintrón pulled over the SUV to corroborate the SOI's tips (summarized in agent Kalme's email), he was legitimized to do so. "An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." *U.S. v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011); *U.S. v. Tiru-Plaza*, 766 F.3d 111, 119 (1st Cir. 2014)("traffic infraction was sufficient to justify the initial stop"). Thus, defendants' challenge and characterization of the traffic stop as a pretext to corroborate the tip is misplaced. The

undisputed evidence reveals that the traffic stop ensued from the agents' probable cause of

defendants' violation of traffic laws.

### C.    The search

The Court now addressed defendants' third and last argument aimed at the search

conducted on February 11, 2017.

Importantly, defendants do not question the fact that they provided consent for the agents

and the K-9 to search the vehicle and the vessel, nor do they argue coercion or intimidation

played a role in the voluntariness of the consent. Rather, defendants contend that the consent

was "invalid, since it hinges on the information acquired in the curtilage breach," referring to

the agents' observations of the property on February 10, 2017, discussed at length above. **ECF**

**No. 97** at 28. Because the agents "misrepresented" the reasons for the intrusion into the property,

defendants argue, "the consent is absent attenuation to purge the taint of the prior illegal act."

*Id.,* (citing *U.S. v. Cordero-Rosario*, 786 F3d 64, 75-76 (1st Cir. 2015). Defendants also argue that the

agent who conducted the traffic stop "misrepresented the grounds for the stop." *Id*. In

defendants' view, the "real reason for the stop was to act on Kalme's hunch that the vehicle

might be the one they were searching for." *Id*. Finally, defendants ask the Court to apply *Brown*

*v. Illinois'* fruit of the poisonous test: "(1) the time that elapsed between the underlying illegality

and the later acquisition of the evidence at issue; (2) the presence or absence of intervening

circumstances between those points in time; and (3) the purpose and flagrancy of the official

misconduct in question." *Id,* 422 U.S. at 603–04. These objections are overruled.

### (i)      Fruit of the poisonous tree

"The indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *United States v. Camacho,* 661 F.3d 718, 729 (1st Cir. 2011) (quoting *New York v. Harris,* 495 U.S. 14, 19 (1990)). "Suppression is not appropriate ... if 'the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint.'" *Id.* (quoting *Segura v. United States,* 468 U.S. 796, 805 (1984)).

Defendants' first argument purports that, since no illegal conduct was perceived by the agents during the traffic stop, the agents' only motivation in securing defendants' consent was the information unlawfully obtained by the agents at the Barrio Obrero property. They further suggest that *U.S. v. Cordero-Rosario* and cases cited therein support their proposition.

While true that the First Circuit has held "that the taint from a prior unconstitutional search may render evidence obtained from a subsequent consent-based search illegal 'fruits of the poisonous tree' that must be suppressed[,]"[8] such is not the case here. In *U.S. v. Cordero-Rosario,* the First Circuit concluded that the search conducted by Puerto Rico authorities ran afoul defendant's Fourth Amendment rights. The Court then proceeded to evaluate whether the initial

---

[8] *U.S. v. Cordero-Rosario,* 786 F.3d 64, 66 (1st Cir. 2015)(citing *United States v. Navedo–Colón,* 996 F.2d 1337, 1338–39 (1st Cir.1993)).

search tainted the independent and subsequent search conducted by federal authorities. Here, however, as discussed above, defendants failed to show any expectation of privacy within the property located in Barrio Obrero that would render the search unconstitutional. Thus, all arguments grounded on the alleged breach of Barrio Obrero property necessarily fail. "Because we see no constitutional violations, we need not address [the fruit of the poisonous tree] argument." *U.S. v. Dion*, 859 F.3d 114, 133 (1st Cir. 2017).

But even if for argument's sake the Court assumed defendants had an expectation of privacy at Barrio Obrero, the Court would nonetheless deny defendants' motion to suppress. First of all, "[d]etermining the consequences of unlawful police conduct for seized evidence requires looking at both causation and attenuation." *U.S. v. Camacho*, 661 F.3d 718, 729 (1st Cir. 2011).

To determine if the taint from a prior unconstitutional search renders illegal evidence obtained in a subsequent consent-based search, Court must "determine whether the causal link between a prior unlawful search and consent (voluntary though it may have been) to a subsequent search is so tight that the evidence acquired pursuant to that consent must be suppressed." *Id.*, at 76 (citing *United States v. Navedo–Colón*, 996 F.2d 1337, 1339 (1st Cir. 1993)). In doing so, the Court must determine whether "the prior illegality significantly influenced or played a significant role in the subsequent consent." *Id* (internal quotations marks omitted).

In *U.S. v. Navedo-Colón*, 996 F.2d 1337, 1339 (1st Cir. 1993) the First Circuit considered whether the fact that the agents "tol[d]" defendant about the results of the unlawful search

"might have played a causal role in producing consent." *Id*. It also considered that other factors, aside from the unlawful search, "might well have convinced appellant that refusing consent was pointless, for the bags would be opened eventually anyway." *Id* (emphasis added). Accordingly, the way defendants' "mind worked at the time—whether or not the [Barrio Obrero property search] significantly influenced [defendants] decision to consent—is one such factual determination." *Id*.

Here, the record does not support that any "prior illegality significantly influenced" defendants' consent. Nothing in the record indicates that the agents made defendants aware of the incident at Barrio Obrero on February 10, 2017, the SOI's tips or any other fact that would influence defendants' decision to consent to a search of the vessel. Neither do defendants contend that the agents resorted to trickery in obtaining their consent. According to the evidence on record, the only communication between defendants and the agents on February 11, 2018 ensued and was related to the traffic stop and the missing registration papers of the vehicle.

Defendants do not convincingly claim that the agent's request for defendants to step out of the vehicle served as an *in terrorem* tool to obtain consent. The request came out of concern for the agent's safety, who was alone (or at least he though he was at the time) when he was going to check the documents provided by defendants. Moreover, defendants provided consent on three separate occasions to three different agents before anyone searched the vehicle or vessel. Accordingly, the Court finds that a subjective causation between February 9, 2017's search of the Barrio Obrero property and February 11, 2017 consent is lacking.

Even if the Court bit into defendants' arguments and held that the February 10, 2017 search of the property in Barrio Obrero was unconstitutional, an alternative ground would preclude suppression. Indeed, facts admitted by defendants provide an alternate ground to support the validity of the search of the vessel and the finding of contraband.

The SOI informed about a 2-men job to smuggle contraband using a vessel that would be towed by a black Lincoln SUV. **ECF No. 89** at 2. According to the tip, the vessel was stowed in Barrio Obrero. The agents visited the Barrio Obrero property on February 9 and 10, 2017. According to defendants' own narrative, on February 9, 2017, the agents drove by but did not enter the property. **ECF No. 97** at 3. From the main street (Avenida Eduardo Conde), the agents were able to see two vessels inside the property. *Id*.[9] The agents were able to see the number 7097HH on the vessel that was closest to the street and took a photograph with a cellphone memorializing the vessel's registration number. *Id*.[10] Defendants do not challenge the constitutionality of the February 9, 2017's observations.

Agent Kalme's email included the February 9, 2017's photograph of the vessel's registration number and the tip related to the make, model, and color of the SUV. One of the recipients of the email devised a large black Lincoln SUV hauling a vessel and heading east bound on state road number 3. **ECF No. 97** at 5. The day after, that same agent spotted the vessel

---

[9] The upper part of the property's fence was constructed with galvanized steel. Even though the R&R only mentions that the gate was open on February 10, the Court notes that the property's gate was open both on February 9 and 10, 2017. *See* **ECF No. 72-1**; **ECF No. 77** at 255.

[10] The record corroborates the fact that the vessel's registration number was visible to anyone transiting through the public thoroughfare. **ECF No. 72-1**.

being dragged out of the water in Las Croabas' boat ramp and being hitched to the large black Lincoln SUV with license plate GAG-532. **ECF No. 89** at 7. The agent confirmed that both the Lincoln SUV and the vessel were the same he saw the day before and noticed that they both matched the information in agents Kalme's email. He then called agent Kalme to convey this information. *Id*. Agent Kalme relayed the information to other officers and agents, one of which ultimately made the traffic stop.

Evidently, even if the Court agreed with defendants as to the unconstitutionality of the search conducted by the agents on February 10, 2017, the poisonous fruit doctrine would not apply here. All the information necessary for agent Nieves to identify the SUV and the vessel on state road number 3 was available even if the agents did not enter the Barrio Obrero property. Moreover, agent Nieves saw a black Lincoln SUV pulling a vessel out of Fajardo's waters. He was close enough to confirm the vessel's registration number matched the photograph taken by the agents on February 9, 2017 and to see that the vehicle pulling the vessel was a black Lincoln SUV. Accordingly, even if the Court disregards the SUV's license plate number obtained by the agents when they entered the Barrio Obrero property on February 10, 2017, agent Nieves had enough information to mark the vessel and the SUV as the vehicles described by the SOI. Namely: (1) the vessel's registration number, (3) the information concerning the make, model, and color of the SUV, and (3) the time and place of the vessel's arrival at Fajardo. Thus, even without the information obtained by the agents during the February 10, 2017 search, the authorities had sufficient information to pulled over the SUV and obtained defendants' consent

even without "exploitation of [the unlawful search]." *Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963) (quoting John MacArthur Maguire, *Evidence of Guilt* 221 (1959)). Put differently, the agents had other "means sufficiently distinguishable to be purged of the primary taint." *Id*.

Because the evidence defendants seek to suppress was also discoverable via unchallenged and valid law enforcement observations on February 9, 2017, defendants' discussion of the attenuation factor under *Brown v. Illinois* is irrelevant.

### (ii)          Length of the traffic detention

Defendants also move the Court to apply the exclusionary rule based on the "unreasonable delay" of the traffic stop. **ECF No. 97** at 28. According to defendants, the 15-minute detention exceeded what the Supreme Court had deemed as unreasonable. *Rodríguez v. U.S.*, 135 U.S. 1609 (2015). *Id*. This argument, too, is unconvincing.

A traffic stop is more akin to a seizure than to an arrest. Generally, "(1) a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop[]… and (2) any action undertaken with respect to the stop must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation[.]" *U.S. v. Dion*, 859 F.3d at 124 (internal citations and quotations marks omitted).

The duration of the stop should "last no longer than is necessary to effectuate" the purpose of the traffic stop. *Rodríguez v. United States*, 135 U.S. at 1614 (citation and internal quotation marks omitted). "[A]ny action undertaken with respect to the stop must be reasonably

related in scope to the stop itself unless the police have a basis for expanding their investigation." *United States v. Dion*, 859 F.3d at 124 (citation and internal quotations omitted). In applying the *Terry v. Ohio*, 392 U.S. 1 (1968) and *Adams v. Williams*, 407 U.S. 143, (1972)'s Fourth Amendment limitations to investigative traffic stop under the suspicion of illegal alien aboard a vehicle, the Supreme Court explained "[t]he officer may… ask [passengers] to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 881–882 (1975)(emphasis added).

As discussed before, there are no doubts as to the fact that the defendants were lawfully pulled over for a traffic violation on February 11, 2017. That brings us to the second factor: reasonableness, which is determined in light of the totality of the circumstances and "requires a practical, commonsense determination." *United States v. Ruidíaz*, 529 F.3d 25, 28 (1st Cir. 2008).

In the case at bar, defendants argue that the agents did not have any reasonable suspicion of criminal activity and thus the enlargement of the time it took for the issuance of the traffic tickets was unreasonable. Yet, the extension was not the result of the agents' suspicion of criminal activity, but rather from defendants' consent to the k-9 search of the vehicle and vessel. Thus, the search was not borne out on the agents' "hunch," as defendants suggest, but rather from defendants' own will. Thereafter, and once probable cause existed, the vehicle and vessel were transported to police headquarters, where a written consent for and search was obtained anew.

Furthermore, First Circuit "case law allows an officer… to inquire into the driver's itinerary." *U.S. v. Dion*, 859 F.3d at 125 (citing *United States v. Fernández*, 600 F.3d 56, 60-62 (1st Cir. 2010). So, here, defendants provided consent before the traffic stop extended to fifteen minutes and during questioning well within the scope of the traffic stop. These two facts position the case at bar outside the *Rodríguez v. U.S.* reasoning.

Furthermore, it is well settled that the interest behind limiting the legal duration of a stop is the detainee's Fourth Amendment rights. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). On the other hand, "[i]t is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Then, defendants' voluntary consent excepted the need for a warrant and probable cause, and with it, the timeliness considerations as stated in the cases referenced by defendants involving unconsented searches.[11] This, of course, does not mean that the search can be unreasonable. But, considering that defendants: (1) provided verbal consent three time, (2) to three different agents, (3) signed a consent form after the fact, (4) never revoked the consent, (5) and the fact that the detention lasted about fifteen minutes render the search and detention perfectly reasonable.

---

[11] As discussed above, defendants do not question the voluntariness of their consent. Defendants only challenged its "validity" under the supposition that "it hing[ed] on the information acquired in the curtilage breach" at the Barrio Obrero property and because it is a "product of the illegal search." **ECF No. 97** at 28 These contentions, however, are unavailing for all the reasons discussed in this opinion.

IV.    **Conclusion**

For the reasons above, the Court hereby **ADOPTS** the R&R at **ECF No. 89** and

**OVERRULES** defendants' objections at **ECF No. 97.**

Accordingly, the motion to suppress at **ECF No. 36** is **DENIED.**

**SO ORDERED**.

At San Juan, Puerto Rico, on this 10th day of August, 2022.


                                              **S/AIDA M. DELGADO-COLÓN**
                                              **United States District Judge**